**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| TESLA, INC.,<br><br>               Plaintiff,<br><br>      v.<br><br>ANGSTROM AUTOMOTIVE<br>GROUP, LLC<br><br>              Defendant. | CIVIL ACTION NO:<br><br>6:26-cv-0477-CRW-DNM |

**DEFENDANT ANGSTROM AUTOMOTIVE GROUP, LLC'S RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
ORDER AND WRIT OF REPLEVIN/SEQUESTRATION**

Defendant Angstrom Automotive Group, LLC ("Angstrom Automotive"), by and through its undersigned counsel, respectfully submits this Response in Opposition to Plaintiff Tesla, Inc.'s ("Tesla") Motion for Temporary Restraining Order and Writ of Replevin/Sequestration. Tesla's Motion should be denied.

Tesla's Motion rests on a fundamental defect that cannot be overcome by the extraordinary relief Tesla seeks: Tesla sued the wrong entity. The Defendant named in this action—Angstrom Automotive Group, LLC ("Angstrom Automotive") — is not the entity in possession of the tooling Tesla seeks to seize. Tools 1–2 and 5–9 identified in Tesla's Motion are in the possession of Angstrom Aluminum Castings Texas, LLC ("AAC-Texas"), a separate legal entity that is not a party to this action. AAC-Texas does not control, is not controlled by, and is not under common control with Angstrom Automotive, which has no operations, employees, and ceased operational activity in 2024. *See* Exh. 1, Banga Decl. ¶¶ 4–7. Tool 3 is with another different and separate company named Enforge, LLC in Albemarie, NC. *See id.* at ¶ 41. Tool 4 is with another different and separate company named Precision Plating Company in Chicago, IL. *See id.*

Moreover, there is no immediate or irreparable harm to support the issuance of an injunction when this is a commercial dispute with any alleged harm compensable by money damages. AAC-Texas offered reasonable commercial alternatives including payment by Tesla of the amount it owes to release the parts it says it needs. Tesla can simply pay what it owes and then litigate any disputed amounts in the ordinary course of a breach of contract claim before this Court or in the already pending state court action in Bell County.

**LEGAL STANDARD**

Injunctive relief is "an extraordinary and drastic remedy," and should only be granted when the movant has clearly carried the burden of persuasion. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). Further, injunctive relief is proper only where the court finds such special and extraordinary circumstances as are necessary to warrant it. *Allen v. Shelton*, 96 F.2d 102, 104 (5th Cir. 1938). As established below, Tesla has failed to carry its burden, and such circumstances are not present here.

Tesla correctly identifies the four factors governing its request for emergency injunctive relief: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the threatened injury to Tesla outweighs any harm to the nonmovant; and (4) that the injunction will not disserve the public interest. These factors are conjunctive, and Tesla must carry its burden on each. *Siders v. City of Brandon, Mississippi*, 123 F.4th 293, 300 (2024).

## I.   TESLA CANNOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS

### A.   Angstrom Automotive Does Not Possess or Control the Tooling.

The first requirement is fatal here. Tesla has not demonstrated a probable right to relief against Angstrom Automotive because the entity it alleges is withholding the tooling is not Angstrom Automotive. Mr. Banga confirms that Angstrom Automotive does not possess any of the tools at issue. Banga Decl. ¶ 7.

Tesla's Motion repeatedly conflates two separate legal entities. Tesla's Bandstra Declaration states that Tesla is familiar with its relationship with "Defendant Angstrom Automotive Group, LLC and the entity that I understand is its affiliate, Angstrom Aluminum Castings Texas, LLC." But Tesla's Bhanse Declaration is even more revealing: Bhanse states that he has served as Tesla's primary point of contact with AAC-Texas, and that AAC-Texas is the entity operating the Anderton Facility. Mr. Banga likewise confirms that AAC-Texas is a separate entity and that Angstrom Automotive does not control or act in concert with it. Banga Decl. ¶¶ 4, 7.

Tesla attaches as its exhibit B-1 the January 3, 2025 acquisition notice from AAC-Texas that identifies AAC-Texas as the entity that acquired Anderton, effective December 31, 2024. And Tesla's own July 20, 2026 notice identifies the facility as the "Angstrom Aluminum Castings Texas LLC (previously Anderton) facility." *See* Tesla Exh. A-4.  Mr. Banga confirms that AAC-Texas was formed in December 2024 to take over Anderton's assets and did not exist before then. Banga Decl. ¶ 9.

Thus, Tesla's own evidence establishes that:

1.  Angstrom Automotive is the named Defendant;

2.  AAC-Texas is a separate legal entity;

3.  AAC-Texas acquired Anderton and operates the Troy facility;

4.  AAC-Texas is the entity with possession of the tooling at issue; and

5.  AAC-Texas is not a defendant in this case.

That distinction is dispositive.

Tesla's conversion theory illustrates the problem. Under Texas law, conversion requires, among other things, that the defendant assume and exercise dominion and control over the property. *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 888 (Tex. App.—

3

Dallas 2009, no pet.). Tesla therefore cannot establish conversion merely by showing that some other entity possesses the property. It must show that Angstrom Automotive exercised dominion and control over the tooling. It has not. Banga Decl. ¶ 7.

The same defect applies to Tesla's contract claim. A breach-of-contract claim requires a valid contract, performance by the plaintiff, breach by the defendant, and resulting damages. *S&S Emergency Training Solutions, Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018). Tesla cannot establish breach by Angstrom Automotive when the entity actually operating the facility and possessing the tooling is AAC-Texas and where, as explained below, Tesla cannot establish that AAC-Texas is bound by the 2021 agreement. Banga Decl. ¶¶ 7, 26.

### B. Rule 65 does not permit Tesla to obtain indirectly against a non-party what it cannot obtain directly against the named Defendant.

Tesla asks the Court to order "Angstrom and its affiliates" to permit Tesla to enter the facility and retrieve the tooling. But Rule 65(d)(2) does not allow a plaintiff to circumvent the requirement that the enjoined party actually be subject to the Court's authority and the underlying claim.

A non-party cannot simply be swept into an injunction by labeling it an "affiliate." Indeed, the Fifth Circuit has recently reiterated that Federal Rule of Civil Procedure 65(d)(2) limits the persons bound by an injunction to the parties, their officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them. *Computer Sciences Corp. v. Tata Consultancy Services Ltd.*, 159 F.4th 429, 454 (5th Cir. 2025). A corporate affiliation, standing alone, does not eliminate the requirements of the Rule.

Here, AAC-Texas is not Angstrom Automotive. It is not owned, operated, or controlled by Angstrom Automotive. And Tesla has produced no evidence establishing that AAC-Texas is acting as Angstrom Automotive's agent or as its instrumentality to evade a court order. Mr. Banga

4

confirms that the entities are separate and that Angstrom Automotive does not control, is not controlled by, or act in concert with AAC-Texas. Banga Decl. ¶¶ 4, 7.  Tesla therefore cannot obtain an order requiring AAC-Texas to surrender property through an injunction nominally entered against Angstrom Automotive.

### C. Tesla's "affiliate" theory fails because AAC-Texas did not even exist when the August 2021 agreement was executed.

Tesla attempts to solve the wrong-defendant problem by relying upon the August 31, 2021 General Terms and Conditions ("GTC") as a purported contract between Tesla and Angstrom Automotive.  But the evidence destroys Tesla's premise.

Tesla's own Exhibit C establishes that AAC-Texas was formed under Delaware law on December 18, 2024—more than three years after the August 31, 2021 GTC. Mr. Banga confirms that AAC-Texas was formed in December 2024 to take over the assets of Anderton and did not exist before that time. Banga Decl. ¶ 9.

Tesla nevertheless argues that Angstrom Automotive somehow signed the 2021 GTC on behalf of AAC-Texas. Tesla's Bandstra Declaration says that Angstrom Automotive purportedly executed the GTC "on behalf of itself and on behalf of its affiliates."  But AAC-Texas was not then an existing legal entity. It could not itself execute, assent to, or authorize an agreement in 2021. Nor has Tesla identified any subsequent written adoption of the GTC by AAC-Texas after it was formed.  Tesla cannot meet the heightened burden required for emergency relief by asking the Court to assume, before discovery or adjudication, that a corporation formed in December 2024 is contractually bound by an agreement executed more than three years earlier by a different entity.[1]

---

[1] If the GTC applies at all, it requires the application of CA law, which states that absent forward-looking language not present in the definition of "affiliate" here, courts should interpret contracts as only applying to those affiliate entities in existence at the time of contracting.  *See Revitch v. DIRECTTV, LLC*, 977 F.3d 713, 718 (9th Cir. 2020).

Moreover, the GTC itself defines an "affiliate" by reference to actual control—an entity "controlling, controlled by, or under common control with" the contracting entity. Tesla has submitted no competent evidence establishing the required control relationship. Its Bandstra Declaration merely says "based on information and belief" that AAC-Texas is controlled by or under common control with Angstrom Automotive. That conclusory assertion cannot carry Tesla's burden for emergency relief, particularly where the defendant expressly disputes the alleged control relationship. Mr. Banga expressly confirms that no such control relationship exists. Banga Decl. ¶ 4.

**D.     The August 2021 GTC Does Not Establish an Enforceable Commitment to Purchase Any Quantity of Parts.**

Tesla's reliance upon the August 2021 GTC is independently defective.

To the extent Tesla contends that the GTC itself constitutes an enforceable agreement governing the sale of goods, the agreement contains no quantity commitment. It does not establish a quantity of products that Tesla was obligated to purchase from Angstrom Automotive, nor does it contain a binding volume commitment. It is instead a framework of general terms under which future transactions could occur through individual purchase orders. The absence of any written quantity commitment is especially significant because there was no written agreement between AAC-Texas and Tesla committing Tesla to purchase any parts or quantities from AAC-Texas despite Tesla promise to do so. Banga Decl. ¶ 26.

Texas Business and Commerce Code § 2.201 provides that a contract for the sale of goods for $500 or more is not enforceable unless there is a writing sufficient to indicate that a contract for sale was made, and the writing cannot support enforcement beyond the quantity of goods shown in the writing. Tex. Bus. & Com. Code § 2.201(a). A quantity is the critical term required by the statute of frauds for a sale-of-goods contract. *See Merritt-Campbell, Inc. v. RxP Products, Inc.*,

164 F.3d 957, 963-964 (5th Cir. 1999) (holding that where a sales agreement failed to sufficiently state a quantity term it did not satisfy the statute of frauds).  Thus, if Tesla's theory is that the 2021 GTC itself constitutes a binding sale-of-goods agreement, it fails because the GTC contains no enforceable quantity terms and expressly disclaims any quantity obligation. Banga Decl. ¶ 26.[2] Essentially, Tesla agrees to nothing.

That distinction matters greatly here. Tesla is attempting to use a general terms agreement to establish an absolute right to property against a separate company, while simultaneously relying upon individual purchase orders and transactions with Anderton to establish ownership. Those are separate legal relationships involving different entities at different times.  The Court should not convert a general framework agreement between Tesla and Angstrom Automotive into a perpetual property-rights agreement binding upon every future corporate entity that may later become associated with the Angstrom family of companies.

### E. Tesla's Own Asset-Purchase Documentation Undermines its Claim that ACC-Texas Assumed Anderton's Contractual Liabilities.

Tesla's own Exhibit B-1 describes the transaction by which AAC-Texas acquired Anderton as an asset purchase acquisition and expressly asks Tesla to issue new purchase orders to AAC-Texas. Mr. Banga confirms that AAC-Texas was formed in December 2024 to take over Anderton's assets and that AAC-Texas thereafter requested that Tesla issue new purchase orders. Banga Decl. ¶¶ 9, 11.

---

[2] The GTC states in Section 1.4(c) in capital letters that "TESLA MAKE NO WARRANTIES REGARDING THE QUANTITY OF PRODUCTS THAT IT …. WILL ORDER, IF ANY.  TESLA IS NOT REQUIRED TO ISSUE ANY  PURCHASE ORDERS HEREUNDER, AND TESLA IS NOT OBLIGATED TO ISSUE ANY RELEASES UNDER A PRODUCTION PO."  *See* Tesla Exh. A-1.

That is significant.  Texas Business Organizations Code § 10.254(b) provides that a person acquiring property in an asset disposition may not be held responsible for the transferring entity's liability or obligation that the acquirer did not expressly assume. Tex. Bus. Orgs. Code § 10.254(b).

Tesla has not identified an agreement in which AAC-Texas expressly assumed the contractual obligations Tesla now seeks to enforce. To the contrary, Tesla's own evidence establishes that AAC-Texas did not execute a new contract with Tesla when it acquired Anderton. Mr. Banga confirms that AAC-Texas repeatedly requested that Tesla enter into and sign a new Production Pricing Agreement, but Tesla refused to sign one. Banga Decl. ¶ 19.

The January 3, 2025 notice is therefore powerful evidence against Tesla's position. *See* Tesla Exh. B-1.  AAC-Texas announced that it had acquired Anderton in an asset purchase and asked Tesla to issue new purchase orders to AAC-Texas. *See id.* And Banga Decl. ¶ 11.  Tesla cannot simultaneously acknowledge the transaction as an asset purchase requiring new purchase orders and then contend that AAC-Texas automatically became liable for every contractual obligation Tesla previously had with another entity.

### F. Tesla's Purchase Orders and Invoices do not Establish a Clear Right to the Tooling Against AAC-Texas and Certainly Not Angstrom Automotive.

Tesla's purchase-order theory presents yet another fundamental problem.  The purchase orders Tesla relies upon identify Angstrom Aluminum Castings Texas, LLC as the vendor even though AAC-Texas did not exist when those purchase orders were issued. *See* Tesla Exh. A-3.  The relevant tooling purchase orders date from 2022 and 2023, while AAC-Texas was not formed until December 18, 2024. Mr. Banga confirms that AAC-Texas did not exist before December 2024. Banga Decl. ¶ 9.  This calls into question the integrity of the documents submitted by Tesla in support of its motion, and the purported evidence it relies on.

8

Tesla's own evidence confirms the basic chronology: the purchase orders were issued to Anderton during 2022–2023; Anderton manufactured the tooling; Anderton invoiced Tesla; and Tesla paid Anderton during 2022–2024. Tesla's own declaration further confirms that the payments were made to Anderton before the end of 2024.  This is not a minor clerical discrepancy. It goes directly to the identity of the contracting party and the chain of contractual rights.

The invoices Tesla actually paid were issued by Anderton Castings, LLC, not AAC-Texas. The Anderton invoices also contained their own Terms and Conditions of Sale, including provisions governing acceptance, payment, security interests, remedies, damages, modifications, governing law, and forum.  *See id.*  If Tesla relies upon those transactions to establish its rights, it cannot simply disregard all of the contractual terms accompanying those transactions.

Texas follows UCC § 2.207's "battle of the forms" framework. *See* Tex. Bus. & Com. Code § 2.207.  Here, the invoices contained terms that, among other things, provide protections to the seller in the event of nonpayment, limit damages to the purchase price of the products at issue, exclude consequential and other damages, and select Michigan law and exclusive Michigan forums.  At a minimum, those documents demonstrate that Tesla's claimed rights are not the "clear," "unconditional" rights Tesla portrays them to be. They create substantial factual and legal questions concerning which entity contracted with Tesla, what terms governed each transaction, whether those terms were incorporated, what rights Tesla acquired, and what rights remained with the seller. Those disputed questions are precisely why extraordinary emergency relief is inappropriate.

## II.     TESLA CANNOT ESTABLISH IRREPARABLE HARM

### A.     This is a Commercial Dispute for which any Alleged Harm can be Adjudicated in the Ordinary Course and Compensated with Money Damages.

The Fifth Circuit recognizes that an injury is not irreparable where monetary relief can adequately remedy it. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (holding that when "Plaintiffs' only alleged harm can be obviated by monetary relief, it does not constitute the "irreparable" injury necessary to obtain the extraordinary relief of a preliminary injunction.").

Tesla asserts that its alleged money damages are difficult to calculate and are therefore irreparable under applicable law.  But the cases on which Tesla relies for this argument do not support that conclusion. For example, Tesla cites *WorldVue Connect Global, LLC v. Szuch* for the proposition that "impact" on Tesla's hundreds of employees who may be affected by this dispute constitutes irreparable harm. 155 F.4th 472 (5th Cir 2025). But the *WorldVue* decision says nothing of the sort. Instead, that decision considered whether the defendants' ongoing efforts to solicit plaintiff's employees in violation of a TRO constituted irreparable harm. *Id*. at 485-488.

Tesla also asserts that it has shown AAC-Texas's alleged actions threaten irreparable harm under the GTC because Angstrom Automotive and Tesla agreed four years before AAC was formed. As argued elsewhere, the GTC does not apply to nor bind AAC-Texas. So, Tesla's argument fails for that reason alone. But even if the GTC did apply to AAC-Texas, contractual stipulations as to what constitutes irreparable harm are insufficient to support the finding of irreparable harm. The Fifth Circuit made this very point in one of the decisions Tesla cited, *WorldVue*. 155, F.4th at 486; *Trifinity Solutions, LLV v. Seay Money Productions, LLC*, No. 3:26-CV-01073, 2026 WL 1999674 (N.D. Texas, Dallas Div., May 6, 2026).

This case is fundamentally about money. Tesla promised AAC-Texas purchase volumes sufficient to justify AAC-Texas's acquisition of Anderton, including 3,000 Cybertruck parts per week and 8,000 3DI parts per week. *See* Banga Decl. ¶ 10.  In reliance on those commitments,

10

AAC-Texas spent tens of millions of dollars to purchase Anderton's assets and continued staffing and investing in operations and facilities to meet the promised volumes. *See id.*

Tesla can pay the amounts AAC-Texas has demanded or claims are presently owed, restore the production relationship, and then litigate whether those amounts were properly due. That is precisely the solution AAC-Texas proposed before Tesla filed its Motion. *See* Tesla Exh. B-4. Tesla failed to provide the promised weekly releases, AAC-Texas asserted a $2.8 million claim for the initial volume shortfall, and AAC-Texas later reduced that claim to $1.4 million in reliance on Tesla's new pricing and volume commitments. Tesla promised to pay the $1.4 million claim after AAC-Texas provided financial support, but never paid it. Banga Decl. ¶¶ 13–18.

AAC-Texas proposed the following commercially reasonable alternatives before Tesla filed its Motion:

- immediate resumption of parts shipments;

- immediate payment by Tesla of outstanding accounts receivable;

- payment of the plant-opening/continuity costs necessary to keep the facility operating;

- continuation of current pricing while the parties worked through the dispute;

- a revised structure for Cybertruck production; and

- a negotiated resolution of historical claims.

*See* Banga Decl. ¶ 30.

Those proposals were made expressly to preserve supply continuity while the parties resolved their financial disputes. AAC-Texas also offered to enter into a new PPA with minimum volume commitments and SOP/EOP dates, resolve or reserve its rights concerning its past damages claim, or, alternatively, sell the plant to Tesla. Banga Decl. ¶ 30.

Tesla therefore has an obvious means to avoid the very production consequences it claims constitute irreparable harm: pay the amounts claimed, restore production, and litigate the parties'

11

competing monetary and contractual claims afterward. Mr. Banga confirms that AAC-Texas can and will continue to produce the parts Tesla orders and that the parties can continue negotiating a resolution of the larger commercial issues. Banga Decl. ¶¶ 35–37.

Tesla cannot manufacture irreparable harm by refusing to pay disputed amounts and then claiming that the consequences of that refusal require immediate equitable relief. The commercial dispute has already caused AAC-Texas substantial losses: approximately $3.75 million on the Cybertruck program and $8.75 million on the 3DI program through June 2026, with further losses anticipated based on Tesla's current order volumes. Banga Decl. ¶ 21.

**B.      Tesla's Own Assertions Regarding Alternative Suppliers Undermine its Claim of Irreparable Harm.**

Tesla's assertion that it has no alternatives is also disputed. Tesla has three other suppliers for the 3DI parts associated with Tools 1–4. Banga Decl. ¶ 40.  Tesla's claim that the loss of these tools will necessarily halt its production is therefore disputed by the evidence. Tesla has not even picked up the 1,400 such parts that AAC-Texas produced in April 2026. Banga Decl. ¶ 40.

Tesla's Bandstra Declaration itself acknowledges that its alleged production impact depends upon a series of future processes, including moving the tools, shipping them to another supplier, debugging and re-plumbing them, conducting testing and quality assurance, qualifying samples, and ramping up mass production. Tesla estimates that this process would take three to five weeks.

That evidence demonstrates that Tesla's claimed harm is not the immediate destruction of property or an unavoidable catastrophe. It is a commercial supply-chain problem that can be addressed through alternative suppliers, payment, production arrangements, and damages. Moreover, two of the four tools/parts identified in Tesla's Motion—Tools 3 and 4—are not even

at AAC-Texas; Tool 3 is located in North Carolina at Enforge, LLC, and Tool 4 is located in Chicago, IL at Precision Plating Company.  Banga Decl. ¶ 41.

Moreover, Tesla's claim that it has customer orders that will not be filled seems to be quite exaggerated.  *See* Exh. 2 ("It's Looking Like the Cybertruck is the Biggest Flop in Automotive History" dated July 24, 2026), and Exh. 3 ("Tesla's Cybertruck Sales are in a Freefall . . . ." dated July 22, 2026).

Finally, Tesla waited for days after the parties' dispute arose before filing this emergency motion. Tesla demanded access on July 15, 2026, announced a retrieval team on July 17, 2026, attempted retrieval on July 21, 2026, and then did not file this emergency motion until the early morning hours of July 24, 2026. The delay is inconsistent with Tesla's characterization of an immediate emergency requiring the Court to act before the parties' contractual and ownership disputes can be fairly considered. Tesla's July 15, 2026 demand also failed to identify which tools it claimed. Banga Decl. ¶ 29.

There is no immediate or irreparable harm present.

### III.   THE BALANCE OF HARMS STRONGLY FAVORS DENIAL OF THE INJUNCTION

Tesla seeks an order directed at Angstrom Automotive concerning property that Angstrom Automotive does not possess and a facility that Angstrom Automotive does not operate. Mr. Banga confirms that Angstrom Automotive has no operations, employees, or operations and that it does not possess any of the tools at issue. Banga Decl. ¶¶ 5, 7. Issuing such an order would place Angstrom Automotive in the untenable position of being judicially ordered to produce property it does not possess and cannot deliver.

That is not a temporary preservation of the status quo. It would impose an affirmative obligation on an entity that has no ability to comply.  The harm to AAC-Texas is even more

obvious. Although AAC-Texas is not a party, Tesla seeks an order that would effectively compel AAC-Texas to surrender property and relinquish disputed contractual and possessory rights without AAC-Texas having been joined, served as a defendant, or given the opportunity to litigate its own rights. It would also put a number of AAC-Texas employees out of work. AAC-Texas also operates a facility containing tools, equipment, and parts belonging to other customers and is subject to non-disclosure agreements that do not permit Tesla representatives unfettered access to the facility. Banga Decl. ¶ 45. That is fundamentally unfair.

Tesla's request is especially inappropriate because AAC-Texas has a substantial affirmative claim against Tesla arising from Tesla's failure to provide the volumes and releases upon which AAC-Texas relied when it invested in and operated the Texas facility. Mr. Banga states that Tesla's failure to order the quantities it promised caused AAC-Texas losses of approximately $3.75 million on the Cybertruck program and $8.75 million on the 3DI program through June 2026, with additional losses anticipated. Banga Decl. ¶ 21.

As set forth in AAC-Texas's first-filed action, filed July 22, 2026 and amended July 23, 2026, Tesla made commitments concerning purchase orders, releases, volumes, and pricing upon which AAC-Texas relied. AAC-Texas alleges that Tesla failed to provide the promised volumes and releases and failed to pay the resulting deficiencies. Those claims include promissory estoppel and substantial monetary damages. Mr. Banga further states that Tesla's failure to issue the promised weekly releases began in the first three months of 2025 and continued even after the reduced quantities agreed to in April 2025. Banga Decl. ¶¶ 13, 20.

The existence of that first-filed dispute further demonstrates that this is not a simple case of one party stealing another party's property. It is a complex commercial dispute between sophisticated entities concerning production volumes, pricing, expenditures, tooling,

14

modifications, payment obligations, and contractual rights. Mr. Banga also states that Tesla's own supplier scorecard rated AAC-Texas at 99/100, and that Tesla had ordered less than 15-20% of the promised and capacitized Cybertruck volume. Banga Decl. ¶¶ 22–23.

The balance of equities strongly favors allowing those issues to be adjudicated in the ordinary course rather than entering an emergency order against an entity that is not the party in possession.

## IV.     THE PUBLIC INTEREST FAVORS DENIAL OF THE MOTION

The public interest does not favor permitting a litigant to obtain emergency relief against the wrong legal entity.

The public interest favors:

1.     enforcing contracts according to their actual terms and against the parties who actually entered them, *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018);

2.     respecting separate corporate entities, *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798–99 (Tex. 2002);

3.     requiring a plaintiff to establish its claim against the defendant it actually sued, *Texas v. United States Department of Labor*, 929 F.3d 205 (5th Cir. 2019);

4.     protecting non-parties from being deprived of property without notice and an opportunity to be heard, *Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992); and

5.     resolving disputed commercial claims through ordinary judicial procedures, *See Melancon, supra*.

Tesla's requested order would undermine each of these principles.  It would also create precisely the "parade of horribles" Tesla invokes—except the harm would result from Tesla's requested remedy rather than from the absence of an injunction. Tesla can resolve the immediate supply issue by paying the amounts AAC-Texas claims are due, restoring production, and then

litigating the parties' competing claims concerning those payments, the tooling, and the modifications.  That is a practical, commercially rational solution. It avoids disruption to Tesla's production line while preserving each party's (and non-party's) legal rights.

## V.    TESLA HAS NOT ESTABLISHED THE REQUIREMENTS FOR A TEXAS WRIT OF SEQUESTRATION

Tesla's alternative request for a writ of replevin/sequestration fails for the same fundamental reason.  Federal Rule of Civil Procedure 64 makes state-law remedies for seizure of property available in federal court. Tesla therefore relies upon Texas Civil Practice and Remedies Code § 62.001. Tesla correctly quotes the statute as requiring, among other things, a reasonable conclusion of immediate danger involving "the defendant or the party in possession of the property." Tex. Civ. Prac. & Rem. Code § 62.001(1).  But the Defendant is not the party in possession.

Tesla's own evidence identifies AAC-Texas as the entity operating the Troy facility. Tesla's own July 15, 2026 letter identifies the same facility as the AAC-Texas facility. *See* Tesla Exh. B-2.  Mr. Banga confirms that Tesla failed to identify the tools it claimed and that two of the four 3DI tools/parts identified in Tesla's Motion are not at AAC-Texas. Banga Decl. ¶¶ 29, 41.  Thus, Tesla cannot satisfy the statute by alleging that the named Defendant is likely to conceal, dispose of, waste, or destroy property that the named Defendant does not possess.

Nor has Tesla shown an immediate danger of destruction. Tesla's own declaration says the tooling is currently idle. The alleged risk is principally one of future degradation and future production disruption, not an imminent threat that Angstrom Automotive will destroy or remove property. Mr. Banga also states that the tools at issue weigh tons and that each would require up to five hours and dedicated personnel to unload from machines and prepare for delivery or removal. Banga Decl. ¶ 46.  The statutory prerequisites for sequestration therefore have not been met.

16

## VI.    TESLA'S DELAY AND THE PARTIES' PRIOR COMMUNICATIONS FURTHER UNDERMINE THE CLAIM OF AN EMERGENCY

The chronology matters.  Tesla knew for days that AAC-Texas was disputing the identity and ownership of particular tools. Tesla nevertheless did not promptly identify and resolve the alleged tooling issue. AAC-Texas specifically asked Tesla to identify which tools Tesla claimed as its property. Tesla did not do so promptly. AAC-Texas also advised Tesla that it had no contract with AAC-Texas that would authorize Tesla to impose Angstrom Automotive's 2021 terms upon AAC-Texas. Mr. Banga confirms that Tesla's July 15, 2026 demand failed to identify the tools Tesla claimed and that there was no written agreement between AAC-Texas and Tesla committing Tesla to purchase any parts or quantities from AAC-Texas. Banga Decl. ¶¶ 26, 29.

Instead of resolving those basic questions, Tesla waited and then constructed an emergency motion around a 2021 agreement executed by a different entity, years before AAC-Texas existed.

That sequence strongly suggests that Tesla's Motion is not an emergency arising from a clear contractual right. It is an attempt to obtain extraordinary relief before the Court has the opportunity to examine the basic questions of identity, contractual privity, asset acquisition, successor liability, purchase-order formation, invoice terms, tooling ownership, and the parties' competing monetary claims. Those questions are particularly acute here because Mr. Banga states that Tesla's promised volumes were not provided, that Tesla never paid AAC-Texas's reduced $1.4 million claim and now much more. Banga Decl. ¶ 18.  A TRO is not an appropriate mechanism for deciding those disputed issues in Tesla's favor.

## VII.    THE COURT SHOULD DENY TESLA'S REQUEST AND PROCEED TO AN ORDERLY RESOLUTION OF THE PARTIES' DISPUTE

Angstrom Automotive is not asking the Court to adjudicate ownership of every piece of tooling on an emergency record. It asks the Court to recognize the much narrower proposition that Tesla has not carried its burden for extraordinary relief against the entity it actually sued.

If Tesla believes it owns particular tooling, Tesla can identify the specific tools, AAC-Texas can identify the basis for its possessory and monetary claims, and the parties can establish an orderly retrieval process after resolving or securing the disputed amounts. That process is especially necessary because Mr. Banga states that Tesla failed to identify the tools it sought and that the facility contains other customers' tools and equipment subject to confidentiality restrictions. Banga Decl. ¶¶ 29, 45.  Finally, Tesla, in its motion for the first time identified with some specificity the tools it is claiming, a list that needs to be considered, but it also demonstrates that Tesla does not even know what entity has the tools it claims.

Indeed, AAC-Texas offered a practical solution before Tesla filed this Motion: Tesla could pay the amounts necessary to restore supply continuity, production could resume, and the parties could litigate their competing claims without disrupting Tesla's production operations. AAC-Texas offered three alternatives, including resuming shipments upon payment of current accounts receivable and continuing current pricing on a COD basis; establishing new minimum volume commitments and pricing under a new PPA; or selling the plant to Tesla. Banga Decl. ¶ 30.

That solution remains available.  The extraordinary remedy Tesla seeks is not.

## CONCLUSION

For all of these reasons, Defendant respectfully requests that the Court:

1.    DENY Tesla's Motion for Temporary Restraining Order;

2.    DENY Tesla's request for a writ of replevin/sequestration;

3.    DENY Tesla's request for any injunction against Angstrom Automotive or any alleged "affiliate"; and

4.    Grant Angstrom Automotive such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FRITZ BYRNE, PLLC**
402 West Seventh St
Austin, Texas 78701
Telephone: (512) 476-2020
Telecopy: (512) 477-5267

BY:   */s/ Liara A. Silva*
       Liara A. Silva
       State Bar No. 24117923
       Email: lsilva@fritzbyrne.law

**AND**

Todd A. Holleman (MI Bar P57699)
(Pending *Pro Hac Vice* Request)
Miller Johnson
500 Woodward Ave., Suite 3600
Detroit, MI 48226
hollemant@millerjohnson.com
313-672-6939

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July 2026, the foregoing was served upon counsel

of record through the Court's CM/ECF filing system.

*/s/  Liara A. Silva*
Liara A. Silva

19