IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| Tesla, Inc., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 6:26-cv-00477-CRW-DNM |
| | § | |
| Angstrom Automotive Group, LLC, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND WRIT OF REPLEVIN/SEQUESTRATION

Defendant Angstrom Automotive Group, LLC's ("Angstrom Automotive") Response is the continuation of a years-long corporate shell game. Angstrom Automotive expressly contracted with Tesla to be responsible for its affiliates, including AAC-Texas (together, "Angstrom"), and is under common control with those affiliates via ownership and individuals like Angstrom Automotive's CEO and President Mr. Palakurthi. Angstrom cannot operate the Anderton Facility under the Contract for years, email Tesla just last month claiming (wrongly) that Tesla violated that Contract because of its failure to meet commitments for the Anderton Facility **and the very Tooling at issue**, and now claim that it is uninvolved. (*see* Dkt. No. 10-3). Angstrom's attempt to now retroactively disclaim that Contract and the control, connection, or responsibility between Angstrom Automotive and the Anderton Facility through conclusory assertions of corporate separateness are inconsistent with its own representations and actions. Tesla owns the Tooling, Angstrom has refused to release it, and Tesla's supply of critical Cybertruck components will soon be exhausted absent emergency relief. For these reasons and those stated in the Motion, the Court should enter a temporary restraining order, and, separately, a writ of replevin/sequestration.

## ARGUMENT

### I. TESLA HAS SHOWN NEED FOR A TEMPORARY RESTRAINING ORDER

**A.     Angstrom Has Done This Before.**

Tesla's irreparable harm is not just harm to its Cybertruck production line; it is also harm to its ability to enforce a judgment against Angstrom Automotive. Angstrom Automotive is no stranger to the courtroom or playing hide the affiliate ball. In a case in Michigan, similar as to here, Angstrom Automotive was sued and argued that it signed a contract "only as an agent for" one of its affiliates, and thus could not be bound to it. *See Stackpole Int'l Engineered Prods., Ltd. v. Angstrom Auto. Group, LLC*, 52 F.4th 274, 281 (6th Cir. 2022) ("*Stackpole*"). After a jury entered a verdict against it and Angstrom appealed, the Sixth Circuit rejected this corporate evasion

because it found that Angstrom Automotive had "full control" and "oversight of essentially everything" the affiliate did. *Id.* After a $1.1 million judgment was entered, Angstrom Automotive then "resisted all efforts by the plaintiff to . . . collect" and abandoned its own claims against its affiliates for the transparent reason that "the revenue would be allocated to . . . the judgment" that it was "so ardently trying to avoid." Ex. I, Order, *Stackpole,* No. 2:17-cv-13748, at 5-6 (E.D. Mich. Feb. 17, 2026). Angstrom Automotive's post-judgment behavior is so egregious that, earlier this year, the court had to invoke the extraordinary remedy of appointing a limited receiver. *Id.*[1] Angstrom is threatening to close the Anderton Facility; the Court should act to protect Tesla's property.

**B.      Tesla Is Likely to Succeed on the Merits.**

It is undisputed that Tesla owns the Tooling at the Anderton Facility.[2] Bandstra Decl. ¶¶ 23-37. Angstrom Automotive's refusal to release the Tooling or allow access to the Anderton Facility has breached and repudiated the Contract and converted and trespassed against Tesla's property.

**1.      Angstrom Automotive Controls and is Responsible for AAC-Texas.**

To begin, Angstrom Automotive represented in the Contract that it had the right and authority to bind its affiliates. *See* Mot.5. In particular, it (1) signed the Contract "on behalf of itself and its Affiliates," (2) represented that it "has the full right and authority to bind its Affiliates," and (3) agreed that it and its Affiliates were "jointly and severally liable for the

---

[1] State courts have caught on to Angstrom's shell game too. *See* Ex. F-10, *Angstrom Aluminum Castings, LLC v. Reed*, 2023 WL 2051359, at *1 (Mich. Ct. App. Feb. 13, 2023) ("***The president of AAG, Nagesh Palakurthi, described AAG as a holding company*** . . .") (emphasis added). And Angstrom Automotive's judgment creditors have begun garnishing assets. *See* Ex. J at 17.18-19.2.

[2] Tesla has even paid taxes on the Tooling since purchase. *See* Collier Decl. ("Ex. F") ¶ 9 & Exs. F-7, F-8. Indeed, Angstrom does not argue that it has a superior right to the Tooling. *Cf.* ECF 15 ¶ 34 (Answer admitting Angstrom Automotive "never acquired title to Tesla's Tooling").

*Tesla's Reply in Support of Motion for Temporary Restraining Order*
*and Writ of Replevin/Sequestration*                                                          **Page 3 of 13**

obligations of" the Contract. Mot. Ex. A-1 § 6.1(b) & p.23. Because it agreed to that contractual language, Angstrom Automotive is now estopped from denying that it had such authority. *Estate of Wilson*, 64 Cal. App. 3d 786, 800-01 (Cal. Ct. App. 1976) (recognizing contractual estoppel based on recitals in a written instrument between the parties). Angstrom Automotive's promises are also binding on it even if it claims it didn't have the authority to make them then. *See, e.g.*, *Xtria LLC v. Tracking Sys. Inc.*, 345 F. App'x 940, 944 (5th Cir. 2009) (a promise that affiliates would not file suit was enforceable against promisor).[3]

That includes AAC-Texas; AAC-Texas is Angstrom Automotive's "affiliate" as that term is used in the Contract (or even if there was no contract, as used in applicable state law). Mot. Ex. A-1 § 21.1.[4] Perhaps most relevant, they share the same control person, Nagesh Palakurthi, who is Angstrom Automotive's "Manager," CEO, and President and AAC-Texas's "Governing Person." *See* Mot.5-6 & Exs. C & E; *see also* Ex. A-5; Ex. H. That common control alone establishes affiliation, particularly when Mr. Palakurthi personally shut down the Anderton facility on July 13, leaving "no doubt" he controlled the Tooling. Bandstra Suppl. Decl. ("Ex. G") ¶ 26.

---

[3] Angstrom Automotive's sole argument that the promises are not binding is that the Contract is unenforceable because it violates the UCC statute of frauds because it lacks a quantity term. Opp.6-7. But under California law—which the Response argues applies, Opp.5 n.1—the UCC is irrelevant when, as here, the contract pertains to both goods and services and the contract claim "pertains solely to the non-goods aspect of the transaction." *TK Power, Inc. v. Textron, Inc.*, 433 F. Supp. 2d 1058, 1064 (N.D. Cal. 2006).

[4] Angstrom Automotive erroneously argues that AAC-Texas cannot be its affiliate because it was created after the Contract was signed. *Cf.* Opp.5 n.1. But its cited caselaw actually supports the opposite conclusion: the "ordinary meaning" of the word "affiliates" encompasses affiliates present **and future**. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020). Courts only deviate from that ordinary meaning when it has "absurd" results. *Id.* When, as here, the contract and the future affiliate are not "unrelated," there is nothing absurd about construing the contract to encompass the future affiliate. *See, e.g.*, *McDonough v. Bidwill*, 2025 WL 487171, at *10 (D. Ariz. Feb. 13, 2025).

*Tesla's Reply in Support of Motion for Temporary Restraining Order*
*and Writ of Replevin/Sequestration*                                    **Page 4 of 13**

Overwhelming evidence supports Angstrom Automotive's connection to AAC-Texas and also contradicts Mr. Banga's assertion that Angstrom Automotive has been "non-operational since late 2024." Banga Decl. ¶ 7. On January 3, 2025, well after that "non-operational" date, Mr. Banga himself emailed Tesla to notify it that "Angstrom" had acquired the Anderton facility while using his email signature identifying him as a vice president of "Angstrom Automotive Group." Ex. A-7. Anderton's own communications about the acquisition and other publicly-available information around that time confirmed that "Angstrom Automotive Group LLC (or its designated affiliate(s))"[5] made the acquisition. Ex. A-8; *see* Ex. F-1 (press release indicating same). And later that year, Angstrom Automotive employees working with Tesla held themselves out as Angstrom Automotive representatives. *See* Ex. A-6. AAC-Texas's website even reveals its continued affiliation with Angstrom Automotive to this day: its "Contact" page includes a hyperlink labeled "Angstrom Automotive T&Cs" which leads to a document titled "***Angstrom Automotive Group, LLC and Affiliates*** Buyer Terms and Conditions of Purchase." Exs. F-2, F-3 (emphasis added).

Further, on June 15, 2026, when Tesla addressed a notice of default to "Angstrom Automotive," Ex. A-9,  Mr. Banga responded on behalf of all "Angstrom-affiliated entities" (apparently including both Angstrom Automotive and AAC-Texas) and even invoked the Contract that Angstrom now denies applies to the Anderton Facility when doing so. ECF 10-3 at 1. As recently as July 15, 2026 Tesla addressed a demand to Mr. Palakurthi and Mr. Banga as officers of Angstrom Automotive, and Mr. Banga responded without denying that capacity.  Mot. Exs B-2, B-4. And in Angstrom Automotive's very own Response, Mr. Banga—who submitted a declaration pursuant to his position not at Angstrom Automotive or AAC-Texas, but with a

---

[5] Namely, AAC-Texas and potentially unknown others. *Cf.* Ex F-9 (apparently yet another Angstrom-aligned entity Troy Texas LLC owns land on which Anderton facility located).

*Tesla's Reply in Support of Motion for Temporary Restraining Order and Writ of Replevin/Sequestration*

separate non-party Angstrom entity—was somehow able to "confirm," in a declaration supporting *Angstrom Automotive's* Response, that *AAC-Texas* "can and will continue to produce the parts Tesla orders" and that the parties "can continue negotiating a resolution of the larger commercial issues." Banga Decl. ¶¶ 36-37. It is frankly incredible that he would be able to swear to that if the entities weren't subject to common control. And that declaration, along with everything else, is evidence of a single Angstrom business enterprise engaging in a corporate shell game before this Court just as it has (unsuccessfully) before several other courts.

That evidence of affiliation is also evidence of shared executives and non-parties in active concert and participation. Angstrom's argument that a temporary restraining order against Angstrom Automotive would be ineffective overlooks the fact that the Court's order can and should expressly bind AAC-Texas (and its employees) as a non-party "in active concert or participation with" Angstrom Automotive and Mr. Palakurthi and Mr. Banga as Angstrom Automotive's officers. Fed. R. Civ. P. 65(d)(2)(B)-(C). Contrary to Angstrom's argument, *cf.* Opp.4-5, the "active concert or participation" element is capacious and does not even require that the enjoined party control the third party—it suffices for them to be "identified . . . in interest" or "in privity." *Computer Scis. Corp. v. Tata Consultancy Servs. Ltd.*, 159 F.4th 429, 453 (5th Cir. 2025)*; see also Ganpat v. E. Pac. Shipping PTE, Ltd.*, 66 F.4th 578, 585-86 (5th Cir. 2023) (proper to expressly enjoin non-party meeting these criteria). The evidence shows sufficient active concert or participation to support binding AAC-Texas. *See supra*.

## 2. Angstrom Has Wrongfully Refused to Release Tesla's Property.

It is also undisputed that Angstrom, on instructions from its "corporate" team, refused to allow Tesla to retrieve the Tooling from the Anderton Facility (*see* Bhanse Decl. ¶ 23), despite Tesla's clear contractual right to do so. Indeed, Angstrom does not even dispute that Mr. Banga— who speaks for both Angstrom Automotive and AAC-Texas, *see supra,* has refused to allow Tesla

*Tesla's Reply in Support of Motion for Temporary Restraining Order*
*and Writ of Replevin/Sequestration*                                    **Page 6 of 13**

to retrieve the Tooling despite the terms of the Contract allowing Tesla to retrieve its property from the Anderton facility at any time. *Cf.* Mot.3-4, 6-7.

Angstrom's Response that Tesla has not sufficiently identified the Tooling has no merit; its employees at the Anderton Facility, some of whom worked there when Anderton owned it, know what Tooling belongs to Tesla (Ex. G ¶¶ 12-13), those employees have never disputed that the Tooling belongs to Tesla (Ex. G ¶ 17), Tesla's own employees can identify the Tooling (Bandstra Decl. ¶¶ 23-37, Ex. G ¶¶ 15-16), and Tesla has specifically identified the Tooling in its Motion with specific supporting evidence. *See* Bandstra Decl. ¶¶ 23-37.[6] And yet, despite its earlier false claims it doesn't know where or which multi-ton Tools are the ones Tesla seeks, Angstrom still hasn't allowed Tesla's retrieval.

## C.     Only a Temporary Restraining Order Can Prevent Irreparable Harm.

The threatened harm to Tesla is still irreparable. Angstrom's threats to shut down the Anderton facility are explicit and imminent. *See, e.g.,* Ex. G ¶¶ 28 ("I asked Mr. Palakurthi directly whether Angstrom was planning to close the Anderton Facility. Mr. Palakurthi responded "***yes***." I then asked when, and Mr. Palakurthi stated "***ideally yesterday***.") (emphasis added). Because the Tooling at the Anderton Facility isn't producing parts, Tesla's supply of those unique parts will soon be exhausted, with compounding downstream effects—exactly the kind of harm considered irreparable by applicable precedent and the Contract. Mot. 13-15. Angstrom speculates that alternative sources might exist for some of the parts, Opp.12-13, but in fact, Tesla currently has no qualified alternative source for any of them. Ex. G ¶ 39. Since the Motion was filed, Tesla's

---

[6] Angstrom's Response goes far afield by "question[ing] the integrity" of the 2022-23 purchase orders on the ground that they bear the name of AAC-Texas rather than Anderton. Opp.8-9. The reason is simple: When Angstrom acquired Anderton, the vendor name in Tesla's internal system was updated from Anderton to AAC-Texas ***at Angstrom's own request***. Ex. G ¶¶ 18-23. Given that update, there is no way to re-generate the purchase orders to bear Anderton's name. *Id.*

mitigation efforts of reworking existing parts have extended the supply of affected Cybertruck parts by a brief period, but Tesla's supply is still expected to be exhausted shortly. *Id.* ¶ 38.

Angstrom fails to rebut Tesla's irreparable harm, particularly given the contractual stipulation to that effect. Angstrom ignores most of Tesla's cited caselaw, which recognizes loss of customers, goodwill, and human capital, as well as dissipation and deprivation of unique assets—all realistically and imminently threatened here—as irreparable harms. Mot.13-15; *see also, e.g.*, *Petroworks SA v. Rollings*, 2007 WL 1888212, at *3 (S.D. Tex. June 29, 2007) (finding irreparable harm from depriving plaintiff of a drilling rig "currently decaying on [defendant's] property," since "[t]he more time that passes, the more damage is done"). The sole cited case that Angstrom addresses, it misunderstands. *Cf.* Opp.10. While *WorldVue Connect Global, L.L.C. v. Szuch* enforced a noncompete, the relevant point its holding made is that irreparable injury can be established whenever accumulated human capital is lost through workforce displacement. 155 F.4th 472, 487-89 (5th Cir. 2025); *see also Louisiana v. Biden*, 55 F.4th 1017, 1033-35 (5th Cir. 2022) (same). And *WorldVue* expressly declined to opine on whether "a contractual stipulation . . . ***by itself***" can "support a finding of irreparable harm." 155 F.4th at 486 (emphasis added). This Court need not either, since copious other evidence shows irreparable harm—the contractual stipulation merely confirms it. *See* Mot.14-15; Mot. Ex. A-1 § 11.1(e).

Angstrom errs in arguing that Tesla can simply "pay the amounts AAC-Texas has demanded . . . and then litigate whether those amounts were properly due." Opp.11. There is no support for its suggestion that irreparable harm does not exist merely because the party threatening that harm has made a monetary ransom demand for the custom property. And just as important, irreparable harm also exists where defendant's financial condition renders a potential money judgment illusory. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Angstrom Automotive's

current liabilities are significant; the Sixth Circuit recently affirmed a $30 million jury verdict against it for its "failure to properly maintain its manufacturing equipment." *Eaton Corp. v. Angstrom Auto. Group, LLC*, 167 F.4th 823, 826 (6th Cir. 2026). And given Angstrom's track record of using affiliated entities to evade its obligations*, see supra*; *see also* Ex. F-11 *Bullock v. Palakurthi (In re Wrena, LLC),* Adv. Pro. No. 26-04070-MAR Doc. 1, (Bankr. E.D. Mich. February 27, 2026), if Tesla were to pay Angstrom's ransom and then pursue monetary claims, there is every likelihood it would never be able to enforce the resulting money judgment.

Angstrom's claim that Tesla's ten-day sprint from learning of Angstrom's planned shutdown to filing the instant Motion somehow was not fast enough is simply absurd. Opp.13, 17. The kind of delay that may weigh against a finding of irreparable harm is measured in months, not days. *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 719 (E.D. Tex. 2020). For all these reasons, the threatened harm to Tesla is irreparable by a money judgment.

## D.    The Balance of Hardships Strongly Favors Tesla.

The balance of hardships also favors Tesla. Mot.15-16. Angstrom errs in arguing that Tesla seeks to "impose an affirmative obligation on an entity that has no ability to comply." Opp.13. To the contrary, Tesla asks the Court to require Angstrom Automotive to cease interfering with Tesla's right to retrieve its own property—a right expressly agreed to in the Contract—and to cause its affiliates to do the same. Angstrom has no legitimate interest in continuing to withhold property it does not and has never owned, and it has actively been breaching its duties and obligations to Tesla; Tesla asks the Court to issue an order to Angstrom to **stop** committing those breaches.

The Response's discussion of the harm that would befall AAC-Texas if it were required to surrender the Tooling further confirms that Angstrom Automotive and AAC-Texas speak with a single voice, *see supra*. But it fails to show anything else; Angstrom cannot be harmed by Tesla removing Tooling that Angstrom is not currently using and cannot use in the future for anything

*Tesla's Reply in Support of Motion for Temporary Restraining Order*
*and Writ of Replevin/Sequestration*                                          **Page 9 of 13**

other than making Tesla parts. That position is also irreconcilable with Angstrom's own conduct; it was Angstrom's CEO who announced the imminent shutdown of the Anderton facility and the refused to cooperate on any exit plan.  Angstrom cannot simultaneously announce that it is closing the facility and then claim that releasing the Tesla Tooling that it is not using it would cause irreparable harm to its operations. As for AAC-Texas's alleged affirmative claims against Tesla—which Tesla vigorously disputes—there is no counterclaim in this case and more importantly these claims are monetary in nature, can be adjudicated in the ordinary course, and are irrelevant to the balance-of-harms determination on the ownership of Tesla's Tools.

**E.    The Requested Relief Will Not Disserve the Public Interest.**

The temporary restraining order will also not disserve the public interest. Mot.16. Angstrom fails to show otherwise. It argues repeatedly that Angstrom Automotive and AAC-Texas should be respected as separate entities, Opp.15, but ignores that Tesla, a Texas corporation, *see* Exs. F-4, F-5, F-6, seeks to hold Angstrom Automotive (as its own entity) to its own contractual commitments on behalf of itself and its affiliates within this State. *See supra*. Discovery may show that these entities are mere alter egos – but that is not the legal test raised by Tesla's motion.  The public has an interest in enforcing contracts, *McKissock, LLC v. Martin*, 267 F.Supp.3d 841, 860 (W.D. Tex. 2016); issuing emergency relief for Tesla will only further the public's interest.

**II. <u>TESLA HAS ESTABLISHED ITS ENTITLEMENT TO A WRIT OF REPLEVIN.</u>**

Tesla has also independently established its entitlement to a writ of sequestration under Texas Civil Practice and Remedies Code § 62.001 because it has shown that Angstrom "possess[es]" the Tooling that Tesla indisputably owns and there is an "immediate danger" of its destruction or removal. Mot.16-19. Angstrom's contrary arguments both fail.

First, the argument that Angstrom Automotive does not "possess" the Tooling because AAC-Texas directly owns the Anderton Facility, Opp.16, is both facially wrong (a different entity

owns that facility (*see* Ex. F-9)) and it ignores the mountain of evidence of common control. *See supra*. Where a defendant exercises control over the entity in physical possession of property, he constructively possesses that property. *See Mehan v. WAMCO XXVIII, Ltd.*, 138 S.W.3d 415, 418 (Tex. App.—Fort Worth 2004, no pet.). Angstrom Automotive cannot disclaim possession of the Tooling while simultaneously exercising control over the very entity it admits holds the property.

Second, Angstrom's contention that there is no "immediate danger" because the Tooling is "currently idle," Opp.16, misapprehends both the facts and the law. The Tooling is precision-engineered equipment that degrades when left idle without proper maintenance—a risk that grows with each passing day that the Tooling sits unused in a facility verging on imminent shutdown. Bandstra Decl. ¶ 44. Moreover, Angstrom's own Response alleges that some of the Tooling is currently out of state. The actual geographical spread (as well as the potential geographical spread upon the Anderton Plant closure) of the Tesla Tooling across multiple jurisdictions and affiliates is itself an "immediate danger" that the property will be "removed beyond the limits of the county" and "concealed" within the meaning of the statute. TEX. CIV. PRAC. & REM. CODE § 62.001(1). A writ is necessary to halt any further dissipation and preserve the Tooling pending resolution of this case.

## CONCLUSION

Tesla asks the Court to grant its Motion and issue emergency relief.

Dated: July 31, 2026

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

*/s/ Marc B. Collier*

Marc B. Collier
Texas Bar No. 00792418
marc.collier@nortonrosefulbright.com
Ethan Glenn
Texas Bar No. 24101810
ethan.glenn@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701-4255
Telephone:     (512) 474-5201
Facsimile:     (512) 536-4598

*Counsel for Plaintiff Tesla, Inc.*

## CERTIFICATE OF SERVICE

I certify that, on July 31, 2026, this document was filed and served on all counsel of record via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

Liara A. Silva
State Bar No. 24117923
lsilva@fritzbyrne.law
FRITZ BYRNE, PLLC
402 West Seventh St
Austin, Texas 78701
Telephone: (512) 476-2020
Telecopy: (512) 477-5267

AND

Todd A. Holleman (MI Bar P57699)
*Admitted Pro Hac Vice*
hollemant@millerjohnson.com
Miller Johnson
500 Woodward Ave., Suite 3600
Detroit, MI 48226
313-672-6939

*Attorneys for Angstrom Automotive Group, LLC*

/s/ Marc B. Collier
Marc B. Collier