# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| TESLA, INC., | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 6:26-cv-00477-CRW-DNM |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| ANGSTROM AUTOMOTIVE GROUP, LLC, | § | |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF TESLA, INC.'S FIRST AMENDED COMPLAINT**

Plaintiff Tesla, Inc. ("Tesla") files this *First Amended Complaint* against Defendant Angstrom Automotive Group, LLC ("Angstrom Automotive") and respectfully shows the Court the following:

## I. INTRODUCTION

1. One of the oldest rules taught from the playground is that when property belongs to someone else, you return it. Here, Tesla owns specialized manufacturing tooling that was in Angstrom Automotive's and its affiliates' possession. Tesla designed the tooling, paid for it in full, and has an unconditional contractual right to retrieve it. In July 2026, Tesla demanded the return of its property. Angstrom Automotive refused. Only after this Court intervened and issued a temporary restraining order ("TRO") (and a subsequent order to prevent a dilatory bankruptcy filing from preventing Tesla from acting under that TRO) and the Fifth Circuit denied Angstrom Automotive's emergency appeal of that TRO was Tesla able to retrieve its property.

2. While the Tooling is now back in Tesla's rightful possession, this case is still a live controversy. Angstrom Automotive unlawfully refused, in breach of its contractual obligations, to permit Tesla to retrieve its own property—custom-manufactured tooling, jigs, dies, gauges,

fixtures, molds, patterns, and related equipment (collectively, the "Tooling")—from a manufacturing facility located in Troy, Texas (the "Anderton Facility"). Because Angstrom Automotive wrongfully refused, Tesla suffered costs and expenses that Tesla seeks to recover, along with permanent equitable relief.

3. These facts are undisputed: Tesla designed, commissioned, and paid for that Tooling in full, and had a contractual, unlimited right to retrieve that Tooling from the Anderton Facility. Angstrom Automotive attempted to leverage its possession of Tesla's property to extract commercial concessions to which it has no contractual entitlement, including by conditioning its continued operation of the Anderton Facility and the Tooling on Tesla's agreement to pay Angstrom Automotive $250,000 per week (on top of any payments for parts manufactured and shipped).

4. These efforts failed because this Court issued the TRO that shut down Angstrom Automotive's game of ransom. That TRO not only returned Tesla's Tooling to its possession, but prevented the irreparable harm that would have occurred had Tesla's denial of access to the Tooling continued.

5. But Tesla still suffered significant monetary harm and is entitled to damages—in the form of its attorneys' fees and the other costs and expenses incurred to retrieve the Tooling—to remedy that harm. Because of Angstrom Automotive's refusal to allow Tesla to retrieve its Tooling, Tesla was forced to expend significant costs and expenses—from employee time to third-party rigging companies contracted to remove the Tooling to all of the attorneys' fees necessary to obtain an order requiring Angstrom Automotive to release the Tooling—that Angstrom Automotive is contractually obligated to pay.

6. Tesla filed this suit to retrieve its Tooling. Tesla did so, but that does not mean that this dispute is over. Tesla still has claims for breach of contract, anticipatory repudiation, conversion, and trespass to chattels arising out of Angstrom Automotive's refusal to release the Tooling, and it still needs final and equitable relief to enshrine its right to the Tooling.

## II. PARTIES

7. Tesla is a Texas corporation with its principal place of business in Austin, Texas.

8. Defendant Angstrom Automotive Group, LLC is a Michigan limited liability company. Angstrom Automotive's members are not citizens of Texas. Angstrom Automotive can be served via its registered agent Nagesh Palakurthi at 25330 Telegraph Rd, Southfield, Michigan 48033. Angstrom Automotive has appeared via counsel in this matter.

## III. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between the parties. Tesla, both through its state of incorporation and its principal place of business, is a citizen of the State of Texas. Angstrom Automotive, upon information and belief, is a citizen of the state of Michigan because of the citizenship of its members.

10. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, this District is where a substantial part of the property that is the subject of the action is situated, and because Angstrom Automotive is subject to personal jurisdiction here. Tesla's claims for injunctive and equitable relief are authorized by Federal Rules of Civil Procedure 64 and 65 and the equitable powers of this Court.

## IV. FACTUAL ALLEGATIONS

### A. Angstrom Automotive And Its Affiliates Are Part of a Multinational Group of Affiliated Entities All Sharing Common Ownership and Control.

12. Angstrom Automotive is part of the Angstrom group of companies, a multinational group of affiliated entities consisting of parent holding companies, each of which has multiple wholly owned subsidiary companies, all sharing common ownership and control by the same single person.

13. Beginning in 2016, Angstrom Automotive functioned as the central service entity in the Angstrom ecosystem pursuant to a Management and Administrative Services Agreement it entered into with nearly thirty (30) other Angstrom entities. The same controlling person signed the agreement on behalf of Angstrom Automotive and all the Angstrom entities. Pursuant to that agreement, Angstrom Automotive represented that it would keep records, manage intercompany accounts and transactions, collect all amounts due from third parties, oversee commercial transactions, and otherwise exercise oversight over the Angstrom entities from Angstrom Automotive's corporate office in Michigan.

14. In August 2021, Angstrom Automotive and Tesla entered into a binding agreement—the General Terms and Conditions for Prototype or Production Parts or Services (the "Contract")—governing Angstrom Automotive's supply of vehicle parts to Tesla. Angstrom Automotive (1) signed the Contract on behalf of itself and its Affiliates, (2) represented that it has the full right and authority to bind its Affiliates, and (3) agreed that it and its Affiliates were jointly and severally liable for the obligations of the Contract.

15. Tesla had a similar supplier relationship and contract with non-party Anderton Castings, LLC ("Anderton"). Anderton produced parts for Tesla's Cybertruck using Tesla's

Tooling at its manufacturing facility located at 222 Lely Drive, Troy, Texas 76579 (the "Anderton Facility").

16. On December 31, 2024, Angstrom Automotive and/or other Angstrom entities purchased Anderton. Anderton announced the purchase as being by "Angstrom Automotive Group, LLC (or its designated affiliates(s))," and Angstrom Automotive executives stated that "Angstrom" had acquired Anderton.

17. Shortly before that purchase, non-party Angstrom Aluminum Castings Texas, LLC ("AAC-Texas") was incorporated in Texas. AAC-Texas shares the same control person as Angstrom Automotive. And in this Court, an Angstrom executive (employed by a separate but related Angstrom entity, Angstrom NA, LLC) has made representations regarding AAC-Texas on behalf of Angstrom Automotive, further demonstrating that Angstrom's various entities operate under common control. *See* Dkt. No. 10-1 ¶¶ 36-37.

18. On information and belief, AAC-Texas entered into a lease for the Anderton Facility with another Angstrom-controlled entity, Troy Texas, LLC. At all times, AAC-Texas has operated the Anderton Facility—and Tesla's Tooling therein—subject to the control of Angstrom Automotive and its common control person. The Angstrom executive described above admitted under sworn testimony that it was this control person, and only this control person, who made decisions regarding Tesla's Tooling at the Anderton Facility.

### B. Tesla's Tooling Formerly Located At The Anderton Facility Is Critical To Tesla's Cybertruck Production Line.

19. Tesla designs, manufactures, and sells electric vehicles, energy storage systems, and related products and services. Among Tesla's groundbreaking products is the Cybertruck—a next-generation, all-electric pickup truck. Tesla currently maintains a backlog of customer orders

for the Cybertruck, and most, if not all, of the Cybertrucks currently in production are already assigned to customers.

20. To build such a groundbreaking vehicle, Tesla must design and manufacture custom parts. Those parts are made using unique Tooling that is manufactured specifically to Tesla's specifications. The custom Tesla Tooling then produces parts that can only be used to build Tesla vehicles (with the relevant one here being the Cybertruck).

21. Angstrom Automotive was one of Tesla's suppliers that used Tesla's Tooling. Pursuant to the Contract, Angstrom Automotive and/or its affiliates used Tesla's Tooling to produce some of the parts for Tesla's Cybertrucks and Model Y vehicles.

22. Under the Contract, Angstrom Automotive and/or its affiliates used Tesla's Tooling to produce Tesla parts at the Anderton Facility. On information and belief, AAC-Texas was formed to run the operations of the Anderton Facility subject to the same common control and ownership as Angstrom Automotive. Angstrom Automotive and AAC-Texas held Tesla's Tooling at that Anderton Facility.

23. Tesla's Tooling used to manufacture these parts was developed specifically for Tesla vehicles. Neither these parts nor the Tooling used to create them are obtainable on the open market.

24. In particular, Tesla's Tooling that was at the Anderton Facility produces parts (the "Products") that are critical components designed (as relevant to this suit) specifically and exclusively for Tesla's Cybertruck.

25. The Tooling used to manufacture parts at the Anderton Facility under the Contract was custom-built, extremely complex, and physically substantial; the Tooling in question weighs

literally tons. Moving this Tooling to new facilities is burdensome; trying to construct it from scratch is even more so. Each Tooling piece takes approximately five to six months to build.

26. Because of the Tooling's importance, and because of the difficulty of replacing it, Tesla negotiated for specific provisions in the Contract to protect its rights to the Tesla Tooling, including the ability to enter Angstrom Automotive's facilities to take possession of Tesla's property without liability in trespass and to seek any injunctive relief (at the cost and expense of Angstrom Automotive) required in order to obtain possession of the Tesla Tooling.

27. As detailed below, these provisions were necessary because Tesla has several thousand vehicles that are currently in or planned for production, most, if not all, of which are already committed to customers, and a loss of access to its Tooling (and thus the Products it produces) would result in the imminent loss of Tesla's on-hand inventory and a subsequent disruption to Tesla's production lines.

28. Such production disruptions and parts shortages would cause Tesla immediate and irreparable harm, including its inability to timely deliver vehicles and the erosion of supplier and customer goodwill and to Tesla's own reputation.

### C. Tesla Owns the Tooling That Was in the Anderton Facility; Angstrom Automotive Has Never Owned That Tooling.

29. Before Angstrom Automotive and/or its affiliated entities owned the Anderton Facility, Tesla had a similar supplier relationship with Anderton. Anderton was a casting and manufacturing supplier that operated out of the Anderton Facility, which assets would later be acquired by Angstrom Automotive and/or other Angstrom entities. On March 19, 2021, Tesla and Anderton executed "General Terms and Conditions for Prototype or Production Parts or Services" (the "Anderton Contract").

30. The Anderton Contract is how Tesla ordered, purchased and owns every piece of Tooling that was eventually held by Angstrom Automotive.

31. After signing the Anderton Contract, Tesla devoted significant resources to the development of the Anderton Facility, including but not limited to identifying and developing a particular supplier for Anderton (which was necessary for Anderton to be capable of manufacturing Tesla Products), developing Anderton's capabilities to be a Tier One automotive supplier, and financing the purchase of supplies for and the building of equipment to manufacture Tesla Products.

32. During the years between signing the Anderton Contract and Anderton or its assets being acquired by Angstrom Automotive in or around January 2025, Tesla also engaged in technical work to develop the Anderton Facility's capabilities and equipment.

33. In addition, Tesla devoted extensive engineering resources to the Anderton Facility to develop the manufacturing process for the Cybertruck parts, including by providing review of process flow, cycle time analysis, statistical analysis, and recommendations on machine selection.

34. Specifically, in 2022 and 2023, pursuant to the Anderton Contract, Tesla issued Purchase Orders to Anderton to manufacture the tooling that would be necessary to produce Tesla Products. Each Tooling set was manufactured using a specific combination of die cast tools, trim dies, fixtures, cutting tools, gauge sets, pin presses, x-ray equipment, and other items.

35. Anderton used Tesla's specifications and plans to build the custom Tooling at the Anderton Facility.

36. When Anderton completed manufacturing each Tooling set, it issued a corresponding invoice to Tesla for payment.

37. Anderton invoiced Tesla for all Tooling Orders, and Tesla paid each Anderton invoice in full.

38. In summary, Anderton manufactured the Tooling to Tesla's specifications. Anderton issued invoices, and Tesla then fully paid for the Tesla Tooling.

39. Tesla thus currently owns all Tooling formerly in the Anderton Facility.

**D. Tesla's Contract with Angstrom Automotive Expressly Confirms Tesla's Unconditional Ownership of the Tooling and Its Absolute Right to Retrieve It at Any Time.**

33. At the same time that Tesla was working with Anderton, it also developed a relationship with Angstrom Automotive. On August 31, 2021, Tesla and Angstrom Automotive entered into a supplier contract similar to the Anderton Contract titled "General Terms and Conditions for Prototype or Production Parts or Services" (the "Contract"). Angstrom Automotive executed the Contract on behalf of itself and on behalf of each of its affiliates, thereby binding itself and its affiliates to the Contract's terms, conditions, and obligations.

34. In or around January 2025, Angstrom Automotive and/or its affiliates acquired Anderton, including the Anderton Facility. The acquisition, which was effective as of December 31, 2024, was announced on January 3, 2025, and represented to be made by Angstrom Automotive Group, LLC (or its designated affiliate(s)) or just by "Angstrom." Thereafter, AAC-Texas began operating the Anderton Facility subject to the control of Angstrom Automotive. Neither Angstrom Automotive nor AAC-Texas acquired title to Tesla's Tooling upon acquiring Anderton, because Anderton did not have that title to sell.

### *1. Tesla Has The Unconditional Right to Retrieve Its Property Under the Contract.*

35. Under the Contract, Tesla possessed the unconditional right to take possession of its Tesla Property at the Anderton Facility at any time, with or without cause and without payment of any kind.

36. Tesla's right to possession of the Tooling is absolute. It is not conditioned on the provision of advanced notice to Angstrom Automotive, on the existence of a dispute, on Angstrom Automotive's consent, or on any payment to Angstrom Automotive. Under the Contract, Tesla may retake immediate possession of Tesla Property at any time with or without cause and without payment of any kind.

### *2. Because Angstrom Automotive Refused to Allow Tesla to Retrieve the Tooling, Tesla Had an Express Right to Injunctive Relief Under the Contract.*

37. Under the Contract, Angstrom Automotive's failure to allow Tesla to retrieve the Tooling expressly entitled Tesla to obtain temporary and/or permanent injunctive relief or other equitable relief to retrieve the Tooling without the necessity of posting any bond or proof of action, injury, or damage.

38. Moreover, Angstrom Automotive agreed under the Contract that any such action that Tesla would be forced to take would be at Angstrom Automotive's cost and expense.

### *3. Under the Contract, Angstrom Automotive's Role Was That of a Bailee in Possession of Tesla's Property, and Nothing More.*

39. Angstrom Automotive has never owned the Tooling. Angstrom Automotive never paid or received a single dollar toward the Tooling's design, manufacture, or acquisition. When Angstrom Automotive began to perform under the Contract at the Anderton Facility, which included the performance of its affiliate AAC-Texas, Angstrom Automotive subjected itself to a series of obligations that confirm Angstrom Automotive's limited role as a custodian—not an

owner—of Tesla's Tooling. Among other things, Angstrom Automotive agreed on behalf of itself and its affiliates to: use Tesla Property exclusively for the manufacture, storage, and transport of Products for Tesla; clearly mark and identify Tesla Property as belonging to Tesla; refrain from removing Tesla Property from the premises without Tesla's prior written approval; and maintain and safeguard Tesla Property in good condition.

40. Angstrom Automotive and its affiliate's only role with respect to the Tooling has been to hold it and use it for the manufacture of Products for Tesla until Tesla demanded its return.

### E. Angstrom Automotive Abruptly Stopped Shipment of Parts and Denied Tesla's Attempt to Retrieve the Tooling.

41. On July 13, 2026, the controlling person of both Angstrom Automotive and AAC-Texas informed Tesla during a phone call that Angstrom Automotive intended to shut down the Anderton Facility. He then refused to cooperate with Tesla on any exit plan for Tesla's Tooling within the facility. This announcement came on the heels of months of deficient performance by Angstrom Automotive in its operation of the Anderton Facility, including chronic undershipments.

42. On July 15, 2026, based on Angstrom Automotive's under-shipments and its representation that it was shutting down the Anderton Facility coupled with Tesla's need (based on Angstrom Automotive's refusal to release parts) to retrieve the Tooling to send it to an alternative supplier, Tesla sent Angstrom Automotive a Demand for Immediate Release of Tesla Property.

43. On July 16, 2026, Angstrom Automotive and AAC-Texas's shared controlling person confirmed that Angstrom Automotive had received Tesla's Demand, but did not respond confirming whether or not Tesla would be permitted access.

44. On July 17, 2026, Tesla provided Angstrom Automotive with advance written notice that a Tesla retrieval team would arrive at the Anderton Facility on July 21, 2026 to take possession of Tesla's property.

45. On July 20, 2026, Angstrom Automotive stated in writing that it would not permit Tesla to remove any Tesla Tooling from the Anderton Facility on July 21, 2026. It also—for the first time—demanded compensation for alleged (and unspecified) modifications to the Tooling that Tesla never requested, authorized, or approved. Angstrom Automotive also attempted to condition the continued operation of the Anderton Facility on Tesla paying Angstrom Automotive $250,000.00 per week on top of any amounts paid pursuant to Purchase Orders.

46. That same day, Tesla sent Angstrom Automotive a Notice of Property Retrieval, stating that Tesla would be retrieving the Tesla Property from the Anderton Facility on July 21, 2026.

47. At all times, Tesla addressed its communications to "Angstrom Automotive" and at no point in responding to Tesla did the Angstrom Automotive executives who received those communications deny that capacity or claim that Angstrom Automotive did not have control over the Anderton Facility or Tesla's Tooling therein.

48. On July 21, 2026, Tesla representatives arrived at the Anderton Facility accompanied by a law enforcement officer and a retrieval crew equipped to retrieve Tesla's property. Despite Tesla's clear ownership rights, its repeated written demands, and its advance notice of the retrieval, Angstrom Automotive and AAC-Texas's on-site personnel refused to permit the team to enter the facility, stating that Angstrom Automotive's corporate team had instructed them to deny Tesla access.

49. Before ceasing production, Angstrom Automotive, and/or those acting in concert with it including AAC-Texas, used the Tesla Tooling to manufacture approximately 700 Tesla products that were scheduled to ship to Tesla on July 17, 2026. Angstrom Automotive abruptly cancelled the shipment of those 700 Tesla products and refused further deliveries required under the Contract, causing Tesla's on-hand supply of the Tesla products to dwindle rapidly.

50. Without shipments from Angstrom Automotive, Tesla faced immediate, irreparable harm because of the threat of production delays to several thousand Cybertrucks that were currently in or planned for production—most of which were already assigned to customers, and nearly as many employees were at the ready to produce them.

### F. Tesla Is Forced to Obtain Injunctive Relief from This Court To Retrieve Its Tooling Which It Ultimately Recovered After Angstrom Automotive's Numerous Delay Tactics Are Stopped by Three Separate Court Orders.

51. On July 23, 2026, Tesla filed its *Original Complaint* in this Court, asserting claims for breach of contract, anticipatory repudiation, conversion, and trespass to chattels, and seeking a temporary restraining order and writ of replevin requiring Angstrom Automotive to permit Tesla to retrieve its Tooling and prohibiting Angstrom Automotive from concealing, disposing of, damaging, destroying, or removing any Tesla Property from the Anderton Facility. Dkt. No. 1.

52. Following extensive briefing on Tesla's motion for a temporary restraining order, the Court held a four-plus-hour evidentiary hearing featuring live witness testimony and arguments of counsel on July 31, 2026. Dkt. No. 18. At the end of that hearing, the Court orally granted Tesla's motion for a temporary restraining order, finding that Tesla's witnesses were credible and that all factors for a temporary restraining order were satisfied.

53. On August 3, the Court entered a written order finding that: Tesla's evidentiary witnesses were credible (TRO [Dkt. No. 40] ¶ 3); Tesla has a substantial likelihood of success on the merits (*id.* ¶ 4); Tesla will incur irreparable harm if the requested relief is not granted (*id.* ¶ 5);

the balance of hardships favors Tesla (*id.* ¶ 6); granting the requested relief is in the public interest (*id.* ¶ 7); Tesla owns the Tooling (*id.* ¶ 9); Angstrom Automotive's affiliates, including AAC-Texas, are bound by the order (*id.* ¶ 13); and Angstrom Automotive will use best efforts to prepare the Tooling for removal on August 4, 2026 (*id.*, Ex. A at 2). The Court also found that AAC-Texas could be bound under Rule 65 not just as an affiliate of Angstrom Automotive, but as a part acting "in active concert or participation" with Angstrom Automotive. TRO ¶ 13.

54. The TRO required Angstrom Automotive and all others bound by the order to use best efforts to complete its preparations of the Tooling for removal by 8:00 p.m. C.T. on August 4, 2026, so that Tesla could begin the removal process at the Anderton Facility at 8:00 a.m. C.T. on August 5. Ex. A to TRO. Tesla flew its employees to Texas for this retrieval and engaged a third-party rigging company who allocated and positioned flatbed trucks, forklifts, and voluminous heavy equipment to effectuate it.

55. On the morning of August 4, 2026—four days after this Court ruled in Tesla's favor on the TRO and while Angstrom Automotive and AAC-Texas were supposed to be finishing up their preparation for Tesla's retrieval of the Tooling the next day—Angstrom Automotive filed a motion to stay the TRO in this Court, which denied the motion on the ground that "a stay would substantially injure Tesla in this proceeding given their need for the tooling at issue—[as] discussed at length during the TRO hearing." Dkt. Nos. 20, 28.

56. Minutes after Angstrom Automotive's 8:00 p.m. deadline to prepare the Tooling for removal on August 4, its counsel notified Tesla that AAC-Texas had filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Western District of Texas. *See* Dkt. 30, Exhibit 1. Because of this filing, Tesla was asked to not retrieve its Tooling as the TRO ordered.

Dkt. 30 at 2. Tesla filed a status report in this Court noting the Parties' inability to comply with the TRO on August 5. *Id.* A status conference occurred the next day. Dkt. 32.

57. Following that hearing, the Court issued an order on August 7 that (i) withdrew the reference of the bankruptcy case "as to all issues relating to the Tesla Tooling," (ii) held that the automatic stay is inapplicable to the Tooling because Tesla owns it and it therefore "does not constitute property of the AAC-Texas's debtor's estate," (iii) granted Tesla relief from the automatic stay to the extent it applied because the Tooling "is not necessary to an effective reorganization," and (iv) permitted Tesla to "retrieve its Tooling from the Anderton Facility at the earliest opportunity and [Angstrom Automotive and AAC-Texas] . . . shall cooperate with that retrieval as set out in the TRO." Dkt. 34 at 1-2.[1]

58. Hours after that order, Angstrom Automotive filed an interlocutory appeal in the Fifth Circuit, styled *Angstrom Automotive Group, LLC v. Tesla, Inc.*, No. 26-50650 (the "Appellate Action"), and an emergency motion to stay the TRO pending appeal. *See* Appellate Action, Dkt. No. 12-1. The Fifth Circuit granted an administrative stay that same day (August 7) preventing Tesla from retrieving its Tooling. *See* Appellate Action, Dkt. No. 16-1.

59. On August 10, the Fifth Circuit denied Angstrom Automotive's emergency motion to stay the TRO pending appeal and dissolved the administrative stay. *See* Appellate Action, Dkt. No. 29-2.

60. Tesla retrieved the Tooling from the Anderton Facility on August 10.

---

[1] AAC-Texas instituted a separate state court action against Tesla one day before Tesla filed this lawsuit in the 146th Judicial District Court of Bell County, Texas, styled *Angstrom Aluminum Castings Texas, LLC v. Tesla, Inc.*, Cause No. 26DCV363291. Tesla removed that action to the United States Bankruptcy Court for the Western District of Texas after AAC-Texas filed for bankruptcy. *See Angstrom Aluminum Castings Texas, LLC v. Tesla, Inc*, AP. No. 26-06013-mmp (Bankr. W.D. Tex.). Tesla then filed a motion to withdraw the reference as to that proceeding, which is currently pending, so the entire dispute over Tesla's Tooling can be heard by this Court. *See id.* at Dkt. No. 6.

61. That same day, AAC-Texas filed an interlocutory appeal of its own in the Fifth Circuit, docketed in the same Appellate Action, and sought an administrative stay, stay pending appeal, and a writ of mandamus concerning the Court's August 7 order lifting the automatic stay. *See* Appellate Action, Dkt. No. 39. On August 11, the Fifth Circuit denied AAC-Texas's emergency motion for stay pending appeal, denied AAC-Texas's request for writ of mandamus, and denied AAC-Texas's motion for administrative stay as moot. *See* Appellate Action, Dkt. No. 50-1.

62. On August 12, Tesla retrieved the remaining Tooling from the facility of another Angstrom Automotive entity (Enforge, LLC) in North Carolina.

## V. <u>CAUSES OF ACTION</u>

### COUNT NO. ONE: BREACH OF CONTRACT

63. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

64. On August 31, 2021, Tesla and Angstrom Automotive entered into a valid, enforceable, and binding Contract.

65. the Contract is a valid, enforceable agreement between Tesla and Angstrom Automotive and its affiliates. Angstrom Automotive executed the Contract on behalf of itself and its affiliates, thereby binding them—including non-party Angstrom Aluminum Castings Texas, LLC—to the Contract's terms and obligations.

66. Under the Contract, Tesla owns the Tooling located at the Anderton Facility and has the Contractual right to retrieve its Tesla Property at any time, with or without cause and without payment of any kind.

67. Although Tesla identifies multiple deficiencies by Angstrom Automotive in its performance of the Contract, Tesla only seeks recovery in this proceeding of those costs and expenses it incurred to retrieve the Tooling following Angstrom Automotive's refusal to release it, as the Contract permits.

68. Tesla fully performed all of its obligations under the Contract, or was ready, willing, and able to perform, except to the extent its performance was prevented, hindered, or rendered impossible by Angstrom Automotive's conduct.

69. Angstrom Automotive materially breached the Contract by repeatedly refusing to permit Tesla to retrieve its Tooling from the Anderton Facility, including by physically turning Tesla's employees and crew away, in direct contravention of Tesla's contractual right to do so.

70. Tesla has complied with all conditions precedent to bringing this action, or such conditions have been waived, excused, or rendered futile by Angstrom Automotive's conduct.

71. As a direct and proximate result of Angstrom Automotive's material breaches, Tesla has suffered substantial harm, including irreparable harm prior to the retrieval of the Tooling, as well as substantial costs and expenses necessary for Tesla's efforts to obtain possession of the Tooling, including attorneys' fees, retrieval costs, employee time, and other costs and expenses incurred in connection with Angstrom Automotive's breaches, all recoverable under the relevant sections of the Contract.

72. The relevant section of the Contract, which is governed by California law, establishes that Tesla may obtain a court order for possession of the Tooling and enter the Angstrom Automotive or its affiliate's property to take possession of the tooling at the cost and expense of Angstrom Automotive.

73. Courts applying California law have held that, under a "common sense reading," a contractual provision providing for "reasonable collection costs" incurred when it is "necessary … to initiate legal proceedings" implicitly includes attorneys' fees. *Oklahoma Fixture Co. v. Ask Computer Sys., Inc.*, 45 F.3d 380, 382 (10th Cir. 1995); *see also Mastronardi Int'l Ltd. v. SunSelect Produce (California), Inc.*, No. 1:18-cv-00737-AWI-JLT, 2019 WL 3996608 (E.D. Cal. Aug. 23, 2019), at *12 (holding that the Contractual phrases "the cost of any defense" and "all costs incurred by [by a party in enforcing indemnity obligations]" included attorney's fees); *Aman Truck Lines, LLC v. MST Ins. Servs., Inc.*, No. 2:21-CV-01279-DJC-JDP, 2026 WL 234953, at *2 (E.D. Cal. Jan. 29, 2026) (similar).

74. Accordingly, because the Contract provides for Tesla's costs and expenses in retrieving the Tooling, it is entitled to the attorneys' fees it necessarily incurred to initiate and prosecute this lawsuit and otherwise retrieve the Tooling.

## COUNT NO. TWO: ANTICIPATORY REPUDIATION

75. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

76. An anticipatory breach occurs when a party absolutely repudiates the obligation without just excuse and the other party is damaged by the repudiation.

77. On August 31, 2021, Tesla and Angstrom Automotive entered into a valid, enforceable, and binding Contract.

78. the Contract is a valid, enforceable agreement between Tesla and Angstrom Automotive and its affiliates. Angstrom Automotive executed the Contract on behalf of itself and its affiliates, thereby binding them—including non-party Angstrom Aluminum Castings Texas, LLC—to the Contract's terms and obligations.

79. Although Tesla mentions multiple deficiencies by Angstrom Automotive in its repudiation of the Contract, Tesla ***only*** seeks recovery in this proceeding of those costs and expenses it incurred to retrieve the Tooling following Angstrom Automotive's refusal to release it, just as the Contract permits.

80. Tesla fully performed its obligations under the Contract, or was ready, willing, and able to perform, except to the extent its performance was prevented, hindered, or rendered impossible by Angstrom Automotive's conduct.

81. Angstrom Automotive, through its actions and inactions—including its repeated representations to Tesla—made clear that it intended to breach the Contract by not allowing Tesla to retrieve the Tooling from the Anderton Facility.

82. As a direct and proximate result of the anticipatory breaches of contract by Angstrom Automotive and its refusal to perform under the Contract by permitting Tesla access to its Tooling, Tesla has suffered substantial damages (all of which were incurred as costs and expenses necessary for Tesla's efforts to obtain possession of the Tooling), including attorneys' fees, retrieval costs, employee time, and other costs and expenses, all of which are recoverable under the relevant sections of the Contract, incurred in connection with Angstrom Automotive's anticipatory repudiation.

83. Tesla has complied with all conditions precedent to bringing this action, or such conditions have been waived, excused, or rendered futile by Angstrom Automotive's conduct.

## COUNT NO. THREE: CONVERSION

84. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

85. Tesla owns the Tooling formerly located at the Anderton Facility.

86. By refusing to allow Tesla to retrieve its Tooling and by keeping the Tooling at the Anderton Facility, Angstrom Automotive assumed and exercised unauthorized dominion and control over that property to the exclusion of Tesla's ownership rights.

87. Tesla made repeated requests and demands for Angstrom Automotive to return the Tooling.

88. Despite those requests and demands, Angstrom Automotive refused to return the Tooling to Tesla until required to do so by an order of this Court.

89. Although Tesla mentions multiple deficiencies by Angstrom Automotive in its conversion of the Tooling, Tesla only seeks recovery in this proceeding of those costs and expenses it incurred to retrieve the Tooling following Angstrom Automotive's refusal to release it, just as the Contract permits.

90. As a direct and proximate result of Angstrom Automotive's conversion of Tesla's property, Tesla has suffered substantial damages (all of which were incurred as costs and expenses necessary for Tesla's efforts to obtain possession of the Tooling), including attorneys' fees, retrieval costs, employee time, and other costs and expenses, all of which are recoverable under the relevant sections of the Contract because they were incurred in connection with Angstrom Automotive's conversion and Tesla's retrieval of the Tooling.

91. Tesla is entitled to recovery of its attorneys' fees pursuant to Texas Civil Practice & Remedies Code Section 38.001.

92. Under Texas law, where a conversion claim is "intrinsically founded in the interpretation of a contract" or otherwise "so intertwined with the Contract which underlies th[e] cause of action," then a claimant "would be entitled to recover attorney's fees" under Section 38.001(b)(8). *High Plains Wire Line Servs., Inc. v. Hysell Wire Line Serv., Inc.*, 802 S.W.2d 406,

408 (Tex. App.—Amarillo 1991, no writ); *see also Exxon Corp. v. Bell*, 695 S.W.2d 788, 791 (Tex. App.—Texarkana 1985, no writ) (awarding attorney's fees for conversion claim because its resolution "depended entirely on … contractual interpretation"); *Mustang Trading, Inc. v. Agharanya*, No. 05-91-00659-CV, 1992 WL 106034, at *2 (Tex. App.—Dallas May 19, 1992, no writ) (awarding attorney's fees for a conversion action that was "sufficiently founded upon a contract").

93. Here, Angstrom Automotive's conversion of the Tooling was "intrinsically founded in" and "so intertwined with" the interpretation of the Contract. Accordingly, Tesla is entitled to recover attorney's fees for its conversion claim pursuant to Texas Civil Practice & Remedies Code Section 38.001(b)(8) as part of its costs and expenses in initiating and prosecuting this lawsuit.

94. Tesla has fulfilled the procedural requirements of Texas Civil Practice & Remedies Code Section 38.002 to recover attorney's fees. Section 38.002 requires that "(1) the claimant . . . be represented by an attorney; (2) the claimant . . . present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed . . . not have been tendered before the expiration of the 30th day after the claim is presented." Tex. Civ. Prac. & Rem. Code Ann. § 38.002.

95. Tesla is represented by an attorney.

96. Tesla presented its claim for performance in its demand letters to Angstrom Automotive. *See Criton Corp. v. Highlands Ins. Co.*, 809 S.W.2d 355, 358 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (holding that requests for performance are sufficient to meet the presentment requirement of § 38.002).

97. Angstrom Automotive never tendered performance. Rather, Tesla retrieved the Tooling pursuant to an order of this Court that Angstrom Automotive unsuccessfully opposed and sought to appeal. Accordingly, all three conditions are satisfied for Tesla to recover attorney's fees pursuant to Sections 38.001 and 38.002, and those attorneys' fees were incurred as part of the costs and expenses of initiating and prosecuting this lawsuit.

**COUNT NO. FOUR:**
**TRESPASS TO CHATTELS**

98. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

99. Tesla owns the Tooling formerly located at the Anderton Facility in Troy, Texas.

100. Tesla sent multiple requests and demand letters to Angstrom Automotive demanding that it be allowed into the Anderton Facility to retrieve its Tooling.

101. Tesla also attempted to possess and/or use the Tesla Tooling on July 21, 2026, by sending a representative and a crew, escorted by law enforcement, to retrieve its property.

102. Angstrom Automotive denied Tesla access to the Tesla Tooling and otherwise prevented Tesla from removing the Tooling from the Anderton Facility on July 21, 2026 and before.

103. Tesla had a right under the Contract to access the Anderton Facility at any time to retrieve its Tooling.

104. Angstrom Automotive's denial and prevention deprived Tesla of the use or possession of the Tooling; Angstrom Automotive's actions to retain possession of the Tesla Tooling were wrongful.

105. Although Tesla mentions multiple deficiencies by Angstrom Automotive in its trespass to chattels, Tesla only seeks recovery in this proceeding of those costs and expenses it

incurred to retrieve the Tooling following Angstrom Automotive's refusal to release it, just as the Contract permits.

106. As alleged above, Tesla needed to possess the Tooling to prevent irreparable harm which harm in fact materialized as a result of Angstrom Automotive's wrongful conduct.

107. Angstrom Automotive's refusal prevented Tesla from possessing the Tooling until August 10, 2026, nearly a month after its initial demand.

108. Given the critical nature of the Tooling to Tesla's Cybertruck production line and the dwindling on-hand supply of Products during the period of wrongful retention, Angstrom Automotive's wrongful interference with Tesla's right to possess the Tooling deprived Tesla of possession for a substantial period of time.

109. Therefore, by continuing to retain the Tesla Tooling after Tesla made a demand for it, Angstrom Automotive committed a trespass to chattels.

110. As a direct and proximate result of Angstrom Automotive's trespass to chattels, Tesla has suffered substantial damages (all of which were incurred as costs and expenses necessary for Tesla's efforts to obtain possession of the Tooling), including attorneys' fees, retrieval costs, employee time, and other costs and expenses, all of which are recoverable under the relevant sections of the Contract and which were incurred in connection with Angstrom Automotive's trespass to chattels and Tesla's retrieval of the Tooling.

## VI. <u>DAMAGES</u>

111. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

112. As a proximate and producing cause of all claims asserted herein, Tesla has sustained substantial damages. However, as enumerated above, in this proceeding, Tesla only

seeks to recover the costs and expenses it incurred to retrieve the Tooling following Angstrom Automotive's refusal to release it—including the costs and expenses of initiating and prosecuting this lawsuit—just as the Contract permits.

## VII. JURY DEMAND

113. Tesla requests a jury trial of all issues in this action.

## IX. PRAYER FOR RELIEF

114. WHEREFORE, Tesla respectfully requests that the Court:

a) Grant a preliminary injunction ordering substantially similar relief as the Court granted in the TRO, specifically that:

1) Tesla owns the Tooling;

2) Angstrom Automotive Group, LLC, Angstrom Aluminum Castings Texas, LLC, Enforge, LLC and all of their respective affiliates, and their officers, directors, agents, employees, members, representatives, parents, subsidiaries, and affiliates, and all others acting in concert and in active participation with the foregoing, have no ownership or possessory rights in the Tooling and are enjoined and restrained from hiding, concealing, removing, modifying, selling, damaging, destroying, or otherwise affecting the Tooling; and

3) Angstrom Automotive Group, LLC, Angstrom Aluminum Castings Texas, LLC, Enforge, LLC and all of their respective affiliates, and their officers, directors, agents, employees, members, representatives, parents, subsidiaries, and affiliates, and all others acting in concert and in active participation with the foregoing, are enjoined and restrained from

preventing Tesla from accessing, inspecting, and removing its Tooling at the Anderton Facility and any other location where the Tooling is physically located, and that Tesla shall be allowed to retrieve the Tooling.

b) Grant a permanent injunction permanently ordering substantially similar relief;

c) Enter judgment against Angstrom Automotive and in favor of Tesla for:

1) The costs and expenses incurred by Tesla, including its reasonable and necessary attorneys' fees and costs, to retrieve the Tooling, including those costs and expenses which were incurred initiating and prosecuting this lawsuit;

2) Costs of court; and

3) Any additional relief in law or in equity to which Tesla may be justly or equitably entitled.

Dated: September 11, 2026

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

/s/ Marc B. Collier
Marc B. Collier
Texas Bar No. 00792418
marc.collier@nortonrosefulbright.com
Ethan Glenn
Texas Bar No. 24101810
ethan.glenn@nortonrosefulbright.com
Kayla Ahmed
Texas Bar No. 24136691
kayla.ahmed@nortonrosefulbright.com
Benton McDonald
Texas Bar No. 24143183
benton.mcdonald@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

***Counsel for Plaintiff Tesla, Inc.***